**HUGHES AIR CORPORATION, d/b/a Air West, Petitioner,**

v.

**CIVIL AERONAUTICS BOARD, Respondent.**

**Nos. 26411, 26412.**

United States Court of Appeals, Ninth Circuit.

May 29, 1973.

William C. Burt (argued), Leon M. Kestenbaum, of Koteen & Burt, Washington, D. C., Arthur M. Taylor, San Francisco, Cal., for petitioner.

Warren L. Sharfman, Associate Gen. Counsel (argued), Litigation and Research, C. A. B., Richard W. McLaren, Asst. Atty. Gen., Dept. of Justice, Howard E. Shapiro, Chief, Appellate Section, Antitrust Div., Dept. of Justice, Postmaster General, U.S. Post Office Dept., R. Tenney Johnson, Gen. Counsel, O. D. Ozment, Deputy Gen. Counsel, Robert L. Toomey, Alan R. Demby, C. A. B., Gregory B. Hovendon, Harry First, Dept. of Justice, Washington, D. C., for respondent.

Before ELY, WRIGHT and WALLACE, Circuit Judges.

WALLACE, Circuit Judge:

Hughes Air Corporation, d/b/a Air West, seeks review of the orders [1] of the Civil Aeronautics Board (CAB) which require it, as successor in interest to three airlines (Bonanza, Pacific and West Coast),[2] to refund to the government over $1 million of the subsidies its predecessors received for the years 1964–1966. We have jurisdiction to review the orders. 49 U.S.C. § 1486. Applying the standards of 5 U.S.C. § 701 et seq. (formerly the Administrative Procedure Act), we find the orders arbitrary and set them aside.

The basic issue in this case is whether the CAB can require Hughes to carry back tax losses incurred by its predeces-

---

1. Orders 70–7–73 and 70–7–74 (July 15, 1970).

2. Hughes acquired Air West, Inc.'s certificate of public convenience and necessity on April 3, 1970. Order 70–4–15.

Air West, Inc. was the result of the merger of the Bonanza, Pacific and West Coast airlines on April 17, 1968. Order E–26665. On June 3, 1970, the CAB authorized Hughes to do business under the name "Air West." Order 70–6–27.

sors in 1967 and 1968 to the years 1964–1966 to reduce the allowable subsidy for those years. The issue is critical because the particlular subsidy plans in effect during the two periods differed sharply in their treatment of tax losses [3] and resulted in unequal treatment of carriers.

Air carriers who transport mail can receive two forms of pay. 49 U.S.C. § 1376. The first, service pay pursuant to § 1376(c), represents compensation for actual transportation costs and it is not involved in this case. The second, subsidy pay, is fixed by the CAB and is intended to benefit those carriers whose revenues from commercial operations and postal service payments do not allow them to be self-sustaining. The result is that air postal and carrier service is provided to places commercially infeasible. The basis for this subsidy is "the need of each such carrier. . . ." § 1376(b).

Prior to 1961, the local service carriers, e. g., Bonanza, received subsidies which were determined on an individual basis. However, in 1961, the CAB first adopted a class rate plan applicable generally to all the local service airlines.[4] During the years 1964 through 1966, Class Rates III or III-A [5] provided a basic subsidy to the carrier with a possible rebate of a certain part of profits earned to the government. The rebate procedure was designed primarily to recapture that part of the subsidy which resulted in excessive profits and taxes paid were considered in calculating the profits to be shared. Starting with 1967, the new class rate plan (IV) shifted emphasis to the growth in passenger revenue. Under this plan, the subsidy rebate to the government was based entirely on revenue growth and was unaffected by taxes or net income or loss.

In comparison with prior plans, the new plan was a failure. The Air West companies received a subsidy of about $10 million in 1967 and again in 1968, yet they had net losses totaling some $16 million for those years. They were not alone. During the first three years (1967–1969) of Class Rate IV, the local air service industry had total losses of $113 million despite subsidies amounting to approximately $128 million.

Final subsidy determinations under the various plans would often take years to complete. In fact, the calculations for 1964 through 1966 for the Air West companies were not final when their tax losses for 1967 and 1968 were reported. Under Class Rate IV, these losses had no effect on the subsidies for 1967 and 1968. However, Class Rate III contained a provision requiring that the losses be carried back against the fiscal results of prior years, reducing the credit for taxes paid and increasing net income after taxes and, therefore, ordinarily resulting in a subsidy rebate payable to the government.

During the years involved, some twelve local airlines received subsidies under these class rate plans. Obviously, the CAB could not process final subsidy determinations for all carriers simultaneously. Consequently, some airlines would receive their final rulings before their tax losses in a subsequent year were reported and there would be no loss carryback; others, without final rulings, would have these later losses considered in determining the final amount of their subsidies for a particular past year, resulting in a carryback. This seeming disparity of treatment was equalized under Class Rate III because tax losses

3. The earlier class rates were III and III-A. See Local Service Class Subsidy Rate, 41 C.A.B. 138 (1964); Orders E–23697 (May 18, 1966) and E–23850 (June 23, 1966). In 1967, the CAB adopted Class Rate IV. Order E–25162 (January 1, 1967).

4. Local Service Class Subsidy Rate Investigation, 34 C.A.B. 416 (1961) (Class Rate I).

5. Although these plans differed in certain respects, there were no significant differences relevant to the issues in this case. Hence, we will refer to them collectively as Class Rate III.

reported after the final determination and not carried back would be treated as an income item in the later year. Thus, all airlines would be treated approximately the same, if not in one year, then in the next. The effect of a tax loss would ultimately have a fairly equal impact on the profit sharing of each airline. Over a period of years, the end result was reasonably fair and equitable.

When the CAB shifted to Class Rate IV (revenue growth sharing), tax considerations were no longer important. Thus, if an airline reported a tax loss after January 1, 1967, which might have been carried back to a Class Rate III year and there was a final determination for the prior year, no rebate would be necessary. On the other hand, if the subsequent year's loss had been reported before the earlier determination was final, that airline would be ordered to pay back some of the subsidies previously received. Pacific and West Coast were two of the airlines in the latter group. Hughes, on their behalf, argues that this differing treatment violates the CAB's statutory mandate and arbitrarily discriminates against them.

We are not the first to be confronted with these arguments. *See* Allegheny Airlines, Inc. v. CAB, 465 F.2d 778 (4th Cir. 1972); Texas International Airlines, Inc. v. CAB, 147 U.S.App.D.C. 363, 458 F.2d 782 (1971); Ozark Air Lines, Inc. v. CAB, 441 F.2d 892 (8th Cir. 1971), cert. denied, 404 U.S. 1039, 92 S.Ct. 714, 30 L.Ed.2d 730 (1972). The District of Columbia and the Eighth Circuits rejected the airlines' contentions and affirmed the CAB's order.[6] Only the Fourth Circuit set aside an order, holding "that after abandoning profits as the basis for and the measure of subsidy recapture, profits and losses in subsequent years became irrelevant for all purposes, and tax refunds attributable to losses in subsequent years should not have been used to increase profits in prior years." 465 F.2d at 784. That court found the CAB's treatment to be arbitrary and unreasonable.

We agree with the Fourth Circuit's conclusion. However, though we are impressed by the court's approach, we find the CAB's actions to be arbitrary and unenforceable for a different reason. We would have no difficulty affirming an even-handed order directing all the local airlines with later tax losses to rebate appropriate amounts of earlier subsidies. However, under the facts of this case, we will not order these airlines to pay back their subsidies merely because their tax losses of subsequent years had been reported prior to final determination.

When the CAB shifted from profit sharing to revenue growth sharing, it knew that reported taxes would have no application to future subsidy determination. But surely it was also aware that future tax results would still have a significant impact on Class Rate III computations which were not yet final. It could have provided for an orderly termination of the effects upon prior years' subsidies. Instead, it chose to rely upon a procedure which arbitrarily began to discriminate against some local service carriers. No effort was made to make the new plan compatible with obvious overlapping implications from the prior plan. The equalizing feature of the prior plan was stripped away. Whether a carrier would be forced to return or allowed to keep hundreds of thousands of dollars would turn on fortuitous circumstances, including the order in which the CAB decided to process paperwork and the dispatch with which it was processed. The facts of this case fail to demonstrate any reasonable justification for continued adherence to a procedure which did not treat all members of a class equally.

Admittedly the scope of our review is narrow. *See* 5 U.S.C. § 706. However, we may set aside agency action

---

6. However, the D.C. Circuit noted its discomfort with the situation presented. 458 F.2d at 785.

which is arbitrary or an abuse of discretion if "this court should be of opinion that [the] action was clearly wrong." Bates & Guild Co. v. Payne, 194 U.S. 106, 109, 24 S.Ct. 595, 597, 48 L.Ed. 894 (1904). We are convinced that these orders were clearly wrong and therefore they are unenforceable.

Orders set aside.