**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

UNITED STATES OF AMERICA,
              *Plaintiff-Appellant,*

              v.

ABLE TIME, INC., a California
corporation,
              *Defendant-Appellee.*

No. 06-56033

D.C. No.
CV-04-02695-RMT

OPINION

Appeal from the United States District Court
for the Central District of California
Robert M. Takasugi, District Judge, Presiding

Argued and Submitted
February 15, 2008—Pasadena, California

Filed September 25, 2008

Before: Stephen S. Trott, Richard R. Clifton, and
Consuelo M. Callahan, Circuit Judges.

Opinion by Judge Clifton

13651

---

**COUNSEL**

Charles E. Mullins (argued), United States Nuclear Regulatory Commission, Rockville, Maryland, and Anthony Steinmeyer, Department of Justice, Washington, D.C. for the plaintiff-appellant.

Elon A. Pollack (argued), Stein Shostak Shostak Pollack & O'Hara, Los Angeles, California, and Phyllis G. Pollack, Law Offices of Phyllis G. Pollack, Los Angeles, California for the defendant-appellee Able Time, Inc.

---

**OPINION**

CLIFTON, Circuit Judge:

Able Time, Inc. imported a shipment of watches into the United States. The watches bore the mark "TOMMY," which is a registered trademark owned by Tommy Hilfiger Licensing, Inc. The Bureau of Customs and Border Protection seized the watches pursuant to the Tariff Act, which authorizes seizure of any "merchandise bearing a counterfeit mark." 19 U.S.C. § 1526(e). Tommy Hilfiger did not make or sell watches at the time of the seizure. Customs later imposed a civil penalty upon Able Time pursuant to 19 U.S.C. § 1526(f), which authorizes the imposition of a fine upon any person who imports merchandise that is seized under § 1526(e).[1] The

---

[1]The Tariff Act provides as follows:

district court concluded that, because Tommy Hilfiger did not make watches at the time of the seizure, the watches imported by Able Time were not counterfeit, and the civil penalty imposed by Customs was unlawful.

The government argues that the Tariff Act does not require the owner of the registered mark to make the same type of goods as those bearing the offending mark. The government acknowledges that such a requirement is commonplace in many related trademark statutes but maintains that Congress did not intend to include such a requirement—known as an "identity of goods or services" requirement—in the Tariff Act. Able Time responds by arguing that Congress expressed its intent to require identity of goods in related statutes and legislative history.

---

(e) Merchandise bearing counterfeit mark; seizure and forfeiture; disposition of seized goods

Any such merchandise bearing a counterfeit mark (within the meaning of section 1127 of Title 15) imported into the United States in violation of the provisions of section 1124 of Title 15, shall be seized and, in the absence of the written consent of the trademark owner, forfeited for violations of the customs laws.

. . . .

(f) Civil Penalties

> (1) Any person who directs, assists financially or otherwise, or aids and abets the importation of merchandise for sale or public distribution that is seized under subsection (e) of this section shall be subject to a civil fine.

> (2) For the first such seizure, the fine shall be not more than the value that the merchandise would have had if it were genuine, according to the manufacturer's suggested retail price, determined under regulations promulgated by the Secretary.

19 U.S.C. § 1526. "Any such merchandise" refers to merchandise of foreign manufacture bearing a registered trademark owned by a U.S. citizen or corporation. 19 U.S.C. § 1526(a).

We conclude that the Tariff Act does not contain an identity of goods or services requirement. We hold that Customs may impose a civil penalty pursuant to 19 U.S.C. § 1526(f) upon an importer of merchandise bearing a counterfeit mark, even though the owner of the registered mark does not manufacture or sell the same type of merchandise. We reverse the district court's order granting Able Time's motion for summary judgment and remand for further proceedings.

## I.  Background

Tommy Hilfiger registered the trademark "TOMMY" in International Class 3, which encompasses cosmetics, cologne and similar products, in September 1996.  Customs seized a shipment of watches imported by Able Time bearing the mark "TOMMY" on May 7, 1999.  At the time, Tommy Hilfiger did not manufacture or sell watches, nor was its mark registered in International Class 14, the class that includes watches. Tommy applied for registration in that class on November 30, 1999, and received it on September 17, 2002. Tommy Hilfiger currently sells watches with the "TOMMY" mark.

### A.   The Forfeiture Action

Customs filed an *in rem* forfeiture action against the watches pursuant to 19 U.S.C. § 1526(e) on November 3, 2000.  The district court granted Able Time's motion for judgment on the pleadings on September 24, 2002. The government appealed, and we vacated the district court's judgment and remanded for further proceedings. *See United States v. 2,164 Watches*, 366 F.3d 767 (9th Cir. 2004). The district court dismissed the forfeiture suit without prejudice for defective service of process on September 9, 2004. The government was unable to re-file the forfeiture suit because the statute of limitations had run. It returned nearly all of the watches to Able Time on April 8, 2005.

*B. The Civil Penalty Action*

Customs issued Able Time several notices of civil penalty in February and March of 2004. Customs filed this civil penalty action pursuant to 19 U.S.C. § 1526(f) on April 15, 2004. Able Time filed a motion for summary judgment which the district court initially denied, concluding that jurors could reasonably return a verdict for the government that the watches bore a counterfeit mark. The district court subsequently issued *sua sponte* an order to show cause why it should not reconsider its decision. After further briefing, the district court granted Able Time's motion for summary judgment, concluding as a matter of law that the imported watches could not be counterfeit because Tommy Hilfiger did not make watches at the time of the seizure. The government timely appealed.

## II. Discussion

We have jurisdiction pursuant to 28 U.S.C. § 1291. "We review a grant of summary judgment de novo." *Universal Health Servs., Inc. v. Thompson*, 363 F.3d 1013, 1019 (9th Cir. 2004). "The district court's interpretation of a statute is a question of law also subject to de novo review." *Beeman v. TDI Managed Care Servs., Inc.*, 449 F.3d 1035, 1038 (9th Cir. 2006). We first consider whether this case is moot, which is an issue subject to de novo review that the parties may raise at any time. *S. Or. Barter Fair v. Jackson County*, 372 F.3d 1128, 1133 & n.8 (9th Cir. 2004).

*A. Mootness*

Able Time argues that this case is moot because Customs has returned nearly all the watches. A case becomes moot when there no longer exists a "present controversy as to which effective relief can be granted." *Vill. of Gambell v. Babbitt*, 999 F.2d 403, 406 (9th Cir. 1993) (internal quotation omitted).

**[1]** This action is not moot because the civil penalty remedy is still available. *See Friends of the Earth v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 192-93 (2000) (reasoning that the availability of civil penalties rendered the case not moot); *Ecological Rights Found. v. Pac. Lumber Co.*, 230 F.3d 1141, 1153 (9th Cir. 2000) (same). The provision that authorizes civil penalties, 19 U.S.C. § 1526(f), does not require Customs to retain possession of the offending merchandise during the pendency of a civil penalty suit, nor does it require Customs to successfully attain forfeiture of the merchandise. Subsection (f) requires only that the merchandise be "seized under subsection (e)," which it was. 19 U.S.C. § 1526(f). If the forfeiture action in this case had been dismissed with prejudice, or if Able Time were to show that the seizure was otherwise invalid, then a civil penalty would not be appropriate. But the forfeiture action here was dismissed *without* prejudice, and Able Time has not shown that the seizure was unlawful. Accordingly, the civil penalty remedy is still available and the case is not moot.

### B.　Relevant Statutes

We turn next to the language of the relevant statutes. *See Consumer Prod. Safety Comm'n v. GTE Sylvania, Inc.*, 447 U.S. 102, 108 (1980) ("[T]he starting point for interpreting a statute is the language of the statute itself. Absent a clearly expressed legislative intention to the contrary, that language must ordinarily be regarded as conclusive."). The government argues that the Tariff Act and the statutes that it incorporates do not require the owner of the trademark to manufacture the same goods as those bearing the offending mark. The government argues in the alternative that the agency's interpretation is entitled to deference under *Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 843 (1984), a position we decline to adopt and discuss below at 25-26. Able Time responds by arguing that other sources, such as other statutory language and legislative history, show Congress's intent to require identity of goods or services in the

Tariff Act. We conclude that the plain language is unambiguous and does not contain an identity of goods or services requirement. On remand, the district court will consider whether the other requirements of the Tariff Act have been met.

**[2]** The Tariff Act prohibits the importation of merchandise bearing a registered trademark without the permission of the owner of the trademark:

> [I]t shall be unlawful to import into the United States any merchandise of foreign manufacture if such merchandise . . . bears a trademark owned by a citizen of, or by a corporation or association created or organized within, the United States . . . unless written consent of the owner of such trademark is produced.

19 U.S.C. § 1526(a). The Tariff Act also authorizes seizure and forfeiture if the merchandise bears a counterfeit mark:

> Any such merchandise bearing a counterfeit mark (within the meaning of section 1127 of Title 15) imported into the United States in violation of the provisions of section 1124 of Title 15, shall be seized and, in the absence of the written consent of the trademark owner, forfeited for violations of the customs laws.

19 U.S.C. § 1526(e). The Tariff Act authorizes the imposition of a civil penalty upon an importer whose goods are seized, in an amount not more than the value the merchandise would have had if it were genuine:

> (1) Any person who directs, assists financially or otherwise, or aids and abets the importation of merchandise for sale or public distribution that is seized under subsection (e) of this section shall be subject to a civil fine.

(2)　For the first such seizure, the fine shall be not more than the value that the merchandise would have had if it were genuine, according to the manufacturer's suggested retail price, determined under regulations promulgated by the Secretary.

19 U.S.C. § 1526(f). None of these provisions require the owner of the registered mark to make or sell the same goods as those bearing the offending mark.

**[3]** Subsection (e) of the Tariff Act incorporates two other statutes, 15 U.S.C. § 1127 and 15 U.S.C. § 1124. Both are part of the Trademark Act of 1946, known as the Lanham Act, and neither contains an identity of goods or services requirement. The Tariff Act incorporates the definition of the term "counterfeit" from the first statute: "A 'counterfeit' is a spurious mark which is identical with, or substantially indistinguishable from, a registered mark." 15 U.S.C. § 1127. Able Time argues that 15 U.S.C. § 1127 also defines other terms, such as "trademark" and "use in commerce," that do contain an identity of goods or services requirement. The Tariff Act incorporates only the definition of "counterfeit." Other definitions contained in 15 U.S.C. § 1127 are not at issue here.

**[4]** The Tariff Act incorporates from the second statute the requirement that the offending merchandise "copy or simulate" a registered trademark, which amounts to a requirement that the offending merchandise be likely to cause confusion. The second statute provides: "[N]o article of imported merchandise . . . which shall copy or simulate a trademark registered in accordance with the provisions of this chapter . . . shall be admitted to entry at any customhouse of the United States . . . ." 15 U.S.C. § 1124. Customs has defined a "copying or simulating" trademark as "one which may so resemble a recorded mark or name as to be likely to cause the public to associate the copying or simulating mark or name with the recorded mark or name." 19 C.F.R. § 133.22(a). This is equivalent to the traditional "likelihood of confusion" test for trade-

mark infringement. *See Ross Cosmetics Distrib. Ctrs., Inc. v. United States* ("*Ross I*"), 17 C.I.T. 814, 817-18 (1993) (equating the "copy or simulate" requirement from 15 U.S.C. § 1124 with the likelihood of confusion standard); *Ross Cosmetics Distrib. Ctrs., Inc. v. United States* ("*Ross II*"), 18 C.I.T. 979, 984-85 (1994) (same); 5 J. Thomas McCarthy, *McCarthy on Trademarks and Unfair Competition* § 29:37 (4th ed. 2007) [hereinafter McCarthy] ("[The] 'copy or simulate' . . . test is the same as that used to determine the infringement of a federally registered mark in ordinary litigation."); *see also AMF Inc. v. Sleekcraft Boats*, 599 F.2d 341, 348-49 (9th Cir. 1979) (listing factors relevant to likelihood of confusion analysis, including the strength of the mark, the proximity of the goods, and the similarity of the marks, among others), *abrogated on other grounds by New Kids on the Block v. News Am. Publ'g, Inc.*, 971 F.2d 302, 308-09 (9th Cir. 1992). While public confusion may be more likely where the owner of the registered mark manufactures the same goods as those bearing the offending mark, identity of goods or services is not a requirement, particularly where the other factors weigh in favor of finding confusion.

**[5]** To run afoul of the civil penalty provision of the Tariff Act, then, the offending merchandise must bear a mark identical to or substantially indistinguishable from a registered trademark owned by a United States citizen or corporation, where the offending merchandise copies or simulates the registered trademark, meaning that it is likely to cause the public to associate the offending merchandise with the registered trademark under the *Sleekcraft* factors. *See* 19 U.S.C. § 1526(e)-(f); 15 U.S.C. §§ 1124, 1127; 19 C.F.R. § 133.22(a). Nowhere does this statutory scheme require the owner of the registered mark to make the same goods as those bearing the offending mark.

**[6]** Able Time argues that the reference to "genuine" merchandise and its retail price in 19 U.S.C. § 1526(f)(2), quoted above at 8, shows that Congress intended a civil penalty to

apply only where there is, in fact, a genuine article with which to compare the merchandise bearing a counterfeit mark, *i.e.*, where the owner of the registered mark manufactures the same goods as those bearing the offending mark. The reference to "genuine" goods does not establish such a requirement, however, because the provision in which it appears affects the calculation of the civil penalty, not the initial determination of whether a penalty should apply. This language at best implies that the drafters did not anticipate the specific circumstances of the instant case, not that they intended the civil penalty to be limited to cases involving identity of goods or services. And on its face, the language of 19 U.S.C. § 1526(f)(2) does not require the genuine merchandise to be manufactured by the trademark owner. Here, the term "genuine" could refer to genuine name-brand watches generally.

**[7]** Able Time makes the related argument that it is impossible to calculate the fine in the manner required by § 1526(f)(2), since there can be no retail price for genuine Tommy watches if genuine Tommy watches did not exist at the time. Able Time argues that this impossibility shows that Congress intended to require the owner of the registered mark to manufacture the same goods as those bearing the offending mark. We disagree. The Tariff Act specifies that the fine must be *no more than* the manufacturer's suggested retail price that the merchandise would have had if it were genuine. The legislative history of § 1526(f)(2) provides that the fine should be "meted out at the discretion of the U.S. Customs Service, within the boundaries set out by Congress in the bill." S. Rep. No. 104-177, at 6 (1995). In this case, Customs acted within its discretion when it used the "domestic value" of the merchandise as an approximation in accordance with a Customs directive applicable in similar circumstances.[2]

---

[2]Domestic value is the estimated price an importer will charge a wholesale purchaser. Because retailers must charge more than the wholesale price in order to make a profit, Customs reasonably assumed that the domestic value of the watches would be less than their retail price. In this

### C.   Congressional Intent

In order to overcome this plain language, Able Time must identify a "clearly expressed legislative intention to the contrary." *GTE Sylvania, Inc.*, 447 U.S. at 108. Able Time argues that the presence of an identity of goods or services requirement in related statutes and legislative history shows Congress's intent to require identity of goods or services in the Tariff Act. We disagree. The plain language of the Tariff Act is unambiguous, so related statutes are of limited help. The sequence of enactments of and amendments to the relevant statutes strongly supports the inference that the omission of an identity of goods or services requirement from the Tariff Act was intentional. And the legislative histories of the statutes at issue, and of related statutes, support the plain text interpretation.

### 1.   The Lanham Act

**[8]** Able Time argues that numerous portions of the Lanham Act contain an identity of goods or services requirement, *see, e.g.*, 15 U.S.C. §§ 1051(a)(1), 1057(b), 1058(b), 1114(1)(a), 1115(a), and 1116(d)(1)(B)(i), and that we should read the Tariff Act consistently with the Lanham Act because they are related statutes. The principle that related statutes should be interpreted harmoniously applies only where the plain language of the statute at issue is ambiguous. *See Jonah R. v. Carmona*, 446 F.3d 1000, 1005, 1007 (9th Cir. 2006) (quoting *Jett v. Dallas Indep. Sch. Dist.*, 491 U.S. 701, 738-39

---

case, Customs approximated the price Able Time paid the manufacturer, the expense of bringing the watches to the United States, and a markup for Able Time's estimated profit in selling the watches to a wholesaler. The domestic value determined by Customs in this case is $11.78 per watch. If the district court on remand upholds the imposition of a civil penalty here, it may consider any challenge to this calculation and may set the amount of the civil penalty as it sees fit in accordance with 19 U.S.C. § 1526(f).

(1989) ("*[W]here text permits*, statutes dealing with similar subjects should be interpreted harmoniously.") (emphasis added) (Scalia, J., concurring)). The statutory provisions cited by Able Time are not at issue here. The plain language of the statutes that are at issue is unambiguous and does not require Tommy Hilfiger to have manufactured watches at the time of the seizure for a civil penalty to be imposed. And the presence of an identity of goods and services requirement in related statutes does not constitute a clearly established legislative intention to include a similar requirement in the Tariff Act.

### 2.   Sequence of Statutory Enactments

Congress has shown more than once that it is able to impose an identity of goods or services requirement when it wishes by saying so explicitly in the relevant statutory text. Congress enacted the definition of "counterfeit" in 15 U.S.C. § 1127, at issue here and discussed above, in the Lanham Act in 1946. Congress created the seizure and forfeiture provision of the Tariff Act, 19 U.S.C. § 1526(e), also discussed above, in the Customs Procedural Reform and Simplification Act of 1978 (the "1978 Act"), Pub. L. No. 95-410, 92 Stat 888. Congress created criminal and civil provisions that contain an explicit identity of goods or services requirement in the Trademark Counterfeiting Act of 1984 (the "1984 Act"), ch. XV, §§ 1501-03, Pub. L. No. 98-473, H. R. J. Res. 648 (1984), 98 Stat. 2178.[3] The 1984 Act also amended portions

---

[3]The criminal provision of the 1984 Act penalizes "[w]hoever intentionally traffics or attempts to traffic *in goods or services* and knowingly uses a counterfeit mark on or in connection with such goods or services." 98 Stat. 2178 (1984) (codified at 18 U.S.C. § 2320(a) (2008)) (emphasis added). The criminal provision originally defined "counterfeit mark" as "a spurious mark . . . used in connection with trafficking in goods or services . . . that is identical with, or substantially indistinguishable from, a mark registered *for those goods or services* . . . ." 98 Stat. 2178, 2179 (1984) (codified at 18 U.S.C. § 2320(d)(1)(A) (2006)) (emphasis added). The civil provision created by the 1984 Act defines a "counterfeit mark" as a "counterfeit of a mark that is registered . . . *for such goods or services* sold, offered for sale, or distributed and that is in use." 98 Stat. 2178, 2180 (1984) (codified at 15 U.S.C. § 1116(d)(1)(B)(i) (2008)) (emphasis added).

of the Lanham Act, but it did not alter the definition of "counterfeit" in 15 U.S.C. § 1127, nor did it add an identity of goods or services requirement to the seizure and forfeiture provision, 19 U.S.C. § 1526(e).

Congress created the civil penalty provision of the Tariff Act discussed above, 19 U.S.C. § 1526(f), in 1996 as part of the Anticounterfeiting Consumer Protection Act ("ACPA"), Pub. L. No. 104-153, 110 Stat. 1386. In 2006, Congress amended the language in the criminal provision's definition of "counterfeit mark" to make the identity of goods or services requirement even clearer.[4] Once again, it did not change the definition of "counterfeit" in 15 U.S.C. § 1127, nor did it add an identity of goods or services requirement to the provisions of Tariff Act at issue here, 19 U.S.C. § 1526(e) and (f).

[9] That Congress included an explicit identity of goods or services requirement in both the civil and criminal provisions of the 1984 Act, amended the Lanham Act in 1984, amended the Tariff Act in 1996, and then clarified the requirement in the criminal provision of the 1984 Act in 2006, but never added such a requirement to the provisions of the Tariff Act and Lanham Act at issue here, supports the inference that the omission of such a requirement from those provisions was intentional. *See Beach v. Ocwen Fed. Bank*, 523 U.S. 410, 418 (1998) ("[W]here Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion.") (internal quotation and citations omitted). Congress

---

[4]As amended by the Stop Counterfeiting in Manufactured Goods Act, the criminal provision of the 1984 Act now defines a "counterfeit mark" as "a spurious mark . . . used in connection with trafficking in any goods [or] services . . . that is identical with, or substantially indistinguishable from, a mark registered . . . and in use . . . *that is applied to or used in connection with the goods or services for which the mark is registered*." Pub. L. No. 109-181, 120 Stat. 285, 286-87 (2006) (codified at 18 U.S.C. § 2320(e)(1)(A) (2008)) (emphasis added).

may have wanted to apply a more restrictive definition in the context of criminal suits and civil actions by self-interested private plaintiffs than in penalty suits brought by the government. Whatever its reasons, Congress simply did not include an identity of goods or services requirement in the definition of "counterfeit" contained in 15 U.S.C. § 1127.

> 3.  The Legislative Histories of 19 U.S.C. § 1526(e) and (f)

Congress enacted the civil penalty provision, 19 U.S.C. § 1526(f), in the ACPA in 1996. The legislative history of the ACPA demonstrates that Congress intended to protect consumers who unwittingly purchase "counterfeit products" because such products "are rarely of the same quality as the genuine article," because consumers may blame the owner of the registered mark for their shoddy purchases, and because consumers may suffer harm when substandard products fail. H.R. Rep. No. 104-556, at 1-4 (1996), *reprinted in* 1996 U.S.C.C.A.N. 1074, 1074-77. Able Time argues that this legislative history shows that Congress was thinking in terms of counterfeit *goods*, not counterfeit trademarks separate and apart from the products on which they appear. Able Time argues that this requires reading an identity of goods and services requirement into the Tariff Act.

**[10]** The references to "counterfeit products" and the "genuine article" in the legislative history of § 1526(f) do not constitute the sort of "clearly expressed legislative intention" required to overcome plain statutory text. *GTE Sylvania*, 447 U.S. at 108. The recognition that some cases of counterfeiting will involve the same goods as those manufactured by the owner of the registered mark does not mean that all cases must involve the same goods, particularly in light of plain statutory language with no such requirement. *See* 4 McCarthy § 25:10 ("*Often*, counterfeit merchandise is made so as to imitate a well-known product . . . .") (emphasis added). The references to counterfeit products rather than counterfeit marks

appear in a general discussion of the statute, in a section entitled "Background and Need for the Legislation." H.R. Rep. No. 104-556, at 1, *reprinted in* 1996 U.S.C.C.A.N. at 1075. The passages containing these references do not specifically discuss the definition of the term "counterfeit," and they do not appear intended to define or restrict its meaning. Moreover, applying a civil penalty in the instant case will combat the very harm identified in the legislative history: it will protect consumers from being misled into purchasing generic watches that they mistakenly believe come from Tommy Hilfiger.

**[11]** The legislative history of 19 U.S.C. § 1526(e) also does not undercut the plain text of the Tariff Act. Congress enacted § 1526(e), the seizure and forfeiture provision, in the 1978 Act. The legislative history of the 1978 Act explains that the Senate amendment containing what eventually became § 1526(e) was intended "solely to strengthen the remedies available to prevent the importation of merchandise bearing [a counterfeit] mark." H.R. Rep. No. 95-1517, at 17 (1978) (Conf. Rep.), *reprinted in* 1978 U.S.C.C.A.N. 2249, 2259.[5] If anything, this weighs in favor of construing § 1526(e) to more broadly prevent the importation of merchandise bearing a counterfeit mark. The legislative history also refers to counterfeit marks, which shows Congress was not thinking purely in terms of counterfeit products when it enacted the statute.

---

[5]The legislative history of the § 1526(e) provides:

> The House receded from its disagreement with the Senate amendment with amendments to clearly limit the Senate amendment to merchandise bearing a counterfeit mark as defined in section 45 of the Act of July 5, 1946 (the Lanham Act) [15 U.S.C. § 1127], as the amendment is intended solely to strengthen the remedies available to prevent the importation of merchandise bearing such a mark . . . .

H.R. Rep. No. 1517, at 17 (1978), *reprinted in* 1978 U.S.C.C.A.N. 2249, 2259.

Accordingly, the legislative histories of § 1526(e) and (f) tend to support the plain text interpretation. Our review of the legislative histories of the other statutory provisions directly at issue reveals nothing to the contrary.

### 4.  The Legislative History of the 1984 Act

**[12]** Able Time argues that the legislative history of the 1984 Act shows that Congress was attempting to combat counterfeit products that might cause consumers harm, not counterfeit marks in isolation. We decline to rely on the legislative history of the 1984 Act, however, because it relates only to statutory provisions that are not at issue. *Accord United States v. 10,510 Packaged Computer Towers*, 152 F. Supp. 2d 1189, 1199 (N.D. Cal. 2001) ("Aside from the fact that the cited language [in the legislative history of the 1984 Act] refers to an entirely different statute, its reference is to a criminal statute."); *see also* 2 Anne Gilson LaLonde, *Gilson on Trademarks* § 5.19[2][a] at 5-218 & nn. 16-17 (2007) [hereinafter Gilson] (discussing the civil and criminal provisions of the 1984 Act, not the definition of counterfeit in 15 U.S.C. § 1127).

**[13]** As discussed above, the 1984 Act established civil and criminal provisions with definitions of "counterfeit" that include an express identity of goods or services requirement. *See* 15 U.S.C. § 1116(d)(1)(B)(i); 18 U.S.C. § 2320(e)(1)(A)(iii). Neither of these provisions is at issue. The legislative history of the 1984 Act warns us that "[u]nless it does so explicitly, this act does not in any way modify the Lanham Act or judicial interpretation of it." Joint Congressional Statement on 1984 Trademark Counterfeiting Legislation, 130 Cong. Rec. H12076, H12076 (Oct. 10, 1984) [hereinafter Joint Statement], *reprinted in* 7 McCarthy at App. A8-3. It also recognized that the "Lanham Act relates to 'marks' rather than 'goods or services' " and stated that changing the Lanham Act definition of "counterfeit" to follow the definitions established by the 1984 Act was "beyond the scope" of the

1984 Act, because the 1984 Act was a "compromise" bill, not "an overall redrafting of the trademark law." Joint Statement at H12076, *reprinted in* 7 McCarthy at App. A8-3 to A8-4.[6] These statements weigh against relying on the legislative history of the 1984 Act in any context other than the civil and criminal provisions that it established, neither of which is at issue.

[14] Two other aspects of the 1984 Act deserve mention. Its legislative history states that the definitions of "counterfeit" in the civil and criminal provisions are "identical in substance." Joint Statement at H12078, *reprinted in* 7 McCarthy at App. A8-9.[7] This statement equates the civil provision with

---

[6]The Joint Statement provides:

This key criminal provision represents a compromise between the Senate and House bills. The Senate bill was drafted to prohibit "trafficking in counterfeit goods or services," while the House bill barred "use of a counterfeit mark" in connection with goods or services. Both the House and Senate sponsors recognize that a mark can be "counterfeit" only if it is used in connection with certain types of goods or services. However, conduct regulated by the Lanham Act relates to "marks" rather than "goods or services": the sponsors feared that it might create confusion to adopt the terminology of "counterfeit goods or services" in a piecemeal fashion. An overall redrafting of the trademark laws is an appropriate way to make such changes and is beyond the scope of this legislation.

Joint Statement at H12076, *reprinted in* 7 McCarthy at App. A8-3 to A8-4.

[7]The Joint Statement continues:

The proposed act defines "counterfeit mark" in two places—in the criminal code amendment, proposed 18 U.S.C. 2320(d), and in the Lanham Act amendment, proposed 15 U.S.C. 1116(d)(1)(B) . . . . For technical reasons, the two definitions of "counterfeit mark" differ slightly in their terms, but they are identical in substance. The Lanham Act already contains a definition of the term "counterfeit": a "spurious mark which is identical with, or substantially indistinguishable from, a registered mark." 15 U.S.C. 1127 [sic]. Because it is part of the Lanham Act, the definition of "counterfeit mark" contained in proposed subsection 1116(1)(B) incorporates the section 1127 definition.

Joint Statement at H12078, *reprinted in* 7 McCarthy at App. A8-9.

the criminal provision. It does not equate either of them with the definition at issue here, which is contained in 15 U.S.C. § 1127. It also states that the civil provision's definition "incorporates the section 1127 definition." *Id*; *accord* 2 Gilson § 5.19[3][a] at 5-220. It does not state the converse—that the Section 1127 definition incorporates the civil provision's definition. We reject the contrary conclusions of other authorities. *See United States v. 1,234 Watches*, No. CV-00 11782, Doc. No 46, slip op. at 20-21 (C.D. Cal. Jan. 16, 2002) (unpublished) (concluding that watches bearing the mark "TOMMY" were not subject to forfeiture as counterfeit under 19 U.S.C. §1526(e) because Tommy Hilfiger did not manufacture watches or related goods at the time of seizure) (citing 4 McCarthy § 25:15; *Playboy Enters. v. Universal Tel-A-Talk Inc.*, 48 U.S.P.Q. 2d 1779, 1782 & n.8 (E.D. Pa. 1998)); *Ross II*, 18 C.I.T. at 986.

We decline to narrow the definition of counterfeit contained in 15 U.S.C. § 1127 beyond its plain meaning simply because much of the litigation and academic discussion regarding counterfeit goods arises in the context of the civil and criminal provisions of the 1984 Act, statutes that are not at issue here.

## D.    *"Right in Gross"*

**[15]** The district court granted summary judgment to Able Time in large part because it believed that the government's interpretation ran afoul of the principle that a trademark is not a "right in gross." *See* 4 McCarthy § 24:11. This principle holds that a registered trademark can be used by someone other than its owner so long as the use does not confuse the public, because trademarks are tied to their use on products and do not exist in the abstract. *See id.* The statutory scheme at issue here sufficiently connects the marks and the goods on which they are used. The offending merchandise must "copy or simulate" a registered mark, 15 U.S.C. § 1124, which means that the watches must be likely to cause confusion in

order for a civil penalty to apply. *See* 19 C.F.R. § 133.22(a); *supra* Part II.B. This requirement prevents a step backwards towards a "right in gross" theory of trademark because it requires the owner to use the registered mark. If the owner did not use the mark, then the public would be unlikely to confuse it with the offending mark. Accordingly, even under the government's theory of the case, a trademark is still a "right appurtenant to an established business or trade in connection with which the mark is employed," not a "right in gross or at large." *United Drug Co. v. Theodore Rectanus Co.*, 248 U.S. 90, 97 (1918).

### E. Chevron *Deference*

**[16]** Because the statutes at issue are not ambiguous, we decide this case without giving deference to the government agency. *See Chevron*, 467 U.S. 837, 843 (1984). But even if the statutes were ambiguous, Customs would not be entitled to *Chevron* deference because its position is not the product of sufficiently careful, consistent, or formal procedures "tending to foster the fairness and deliberation that should underlie a pronouncement of [legal] force." *See United States v. Mead Corp.*, 533 U.S. 218, 228, 230 (2001). Customs has not pointed to any regulation, ruling, directive, notice, or other agency determination that formally resolves—or even directly addresses—whether the statutes at issue require an identity of goods or services. The regulations upon which Customs relies track the language of the applicable statutes. *See* 19 C.F.R. §§ 133.21, 133.27. If the statutes were ambiguous, the regulations would be just as ambiguous. Customs is merely advancing a litigation position. *See United States v. Trident Seafoods Corp.*, 60 F.3d 556, 559 (9th Cir. 1995) ("No deference is owed when an agency has not formulated an official interpretation of its regulation, but is merely advancing a litigation position."); *accord Rhodes-Bradford v. Keisler*, 507 F.3d 77, 80 (2d Cir. 2007). Accordingly, Customs's position is due no *Chevron* deference.

*F.   Remand*

**[17]** We remand for the district court to determine whether (1) the mark on the watches is identical to or substantially indistinguishable from the registered mark pursuant to 15 U.S.C. § 1127, and (2) whether the offending mark copies or simulates the registered mark pursuant to 15 U.S.C. § 1124, which amounts to the traditional likelihood of confusion test for infringement. *See supra* Part II.B.

**[18]** Able Time repeatedly cites *Montres Rolex, S.A., v. Snyder*, 718 F.2d 524, 532 (2d Cir. 1983), for the proposition that Customs must compare the registered mark as it appears on actual merchandise with the allegedly counterfeit mark on the watches. *Montres Rolex* does not stand for this proposition. While comparing actual products is preferred, *Montres Rolex* explicitly provided that a comparison to the registration information alone could be sufficient. *Id.* ("We see no reason why a trademark owner would not eagerly cooperate with Customs [by providing product samples with authentic marks], and even if the owner failed to do so after receiving notice of the seizure, Customs could still make its determination based on the mark as registered."). While *Montres Rolex* rejected a comparison to the registration information in that particular case, it did not establish a categorical rule. On remand, the factfinder may compare the offending mark to the mark on the registration certificate, or the district court may admit additional product samples bearing the registered mark into evidence.

## III.   Conclusion

We hold that Customs may impose a civil penalty pursuant to 19 U.S.C. § 1526(f) upon an importer of merchandise bearing a counterfeit mark, even though the owner of the registered mark does not manufacture the same type of merchandise.

**REVERSED and REMANDED.**